# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAURA ATKINS, on her own behalf and on behalf of the estate of JOSHUA PAUL ATKINS,<br><br>Plaintiffs,<br><br>v.<br><br>RUST-OLEUM CORPORATION,<br><br>Defendant. | Civil Action No. 18-1349<br><br>Judge Marilyn J. Horan |

## OPINION AND ORDER

Plaintiffs filed suit against Defendant in the Court of Common Pleas of Allegheny County on September 17, 2018. (ECF No. 1-2). Defendant removed the matter to federal court on the basis of diversity jurisdiction on October 9, 2018. (ECF No. 1). The Complaint alleges claims of negligence per se for alleged violations of the Federal Hazardous Substances Act, 15 U.S.C. § 1261 *et seq.*; negligence; strict liability; and wrongful death. (ECF No. 1-2). Following the completion of fact and expert discovery, Defendant filed the present Motion for Summary Judgment on November 26, 2019. (ECF No. 22).

For the following reasons, the Motion will be denied.

## I. Background

Thirty-one-year-old Joshua Atkins lived with this mother, Laura Atkins, in South Connellsville, Pennsylvania. (ECF No. 25, at ¶ 3). According to Plaintiffs, Joshua had many hobbies and interests, including BMX biking. (ECF No. 1-2, at ¶ 64). One evening in February 2018, after Ms. Atkins left for her night shift at work, Joshua took the front fork of a

1

bike, a metal bowl, a spatula, a tin pan, and a can of Rust-Oleum Aircraft Remover paint stripper into the bathroom. (ECF No. 1-2, at ¶ 72; ECF No. 25, at ¶ 4). He shut the bathroom door and sat in the bathtub with the bike fork, tin pan, bowl, and spatula. (ECF No. 25, at ¶¶ 4, 8). He propped the bike fork up in the tin pan and poured about one-third of the Aircraft Remover into the pan. (ECF No. 26-10, at 2–3). He then set the container of Aircraft Remover on the floor outside the tub. (ECF No. 25, at ¶ 4). Joshua did not open the bathroom window, and the bathroom did not have an exhaust fan. *Id.* at ¶¶ 8–9.

The Aircraft Remover, which Rust-Oleum marketed as a professional grade paint stripper and sold to consumers for household use, contained methanol (sometimes called methyl alcohol) and methylene chloride. *Id.* at ¶¶ 5, 10–11. Both chemicals are hazardous substances under the Federal Hazardous Substances Act (FHSA). *Id.* at ¶ 11. Because the Aircraft Remover contained hazardous substances, the FHSA required that Rust-Oleum place cautionary language on the Aircraft Remover's packaging. *Id.* The front panel on the Aircraft Remover container, manufactured in March 2017 and later purchased by Joshua, stated (in smaller print than appears here):

> DANGER! POISON! [skull and crossbones pictogram]
> VAPOR HARMFUL. CAUSES EYE BURNS. SKIN IRRITANT.
> MAY BE HARMFUL, FATAL OR CAUSE BLINDNESS IF SWALLOWED.
> (See Other Cautions on Back Panel).

*Id.* at ¶ 12. The back panel provided, in English and in Spanish (again, in smaller print than appears here):

> Carefully read all instructions on the Technical Data Sheet and cautions on the MSDS before use. Protect hands with solvent-resistant gloves and eyes with chemical splash goggles.
> DIRECTIONS FOR USE:
> 1. Mask seams and trim openings as this will prevent bleed-back stripping of new finish. 2. Pour remover into a metal container and apply a thick coat with a

chemical resistant brush. If applying to a vertical surface, begin application at the bottom, as vapors are heavier than air and can accumulate near the floor. Apply to one section at a time, up to 9 sq. ft. Brush in one direction only. 3. Allow remover to work until finish is blistered or softened completely, generally within 5-15 minutes. 4. Remove paint with a flexible plastic scraper, and then flush with solvent or water to remove any residue. Allow surface to dry before applying a new finish. Prime metal as soon as possible to prevent flash rust.
Note: This product may not be compatible with all surfaces and all conditions surrounding application. Before applying to any surface, always test product in a small, inconspicuous area to ensure no damage will result. For best results, apply at temperatures between 65° and 90°F (18°C and 32°C), and avoid direct sunlight or strong breezes.

---

DANGER! **CONTAINS METHYLENE CHLORIDE, ETHYL ALCOHOL AND METHANOL.** Do not smoke. Keep away from heat, sparks and flame. Contact with flame or hot surface may produce toxic/corrosive gases. **Use only with adequate ventilation.** Prevent build-up of vapors by opening windows and doors to achieve cross-ventilation. Vapor harmful. May affect the brain or nervous system causing dizziness, headache or nausea. Methylene chloride has been shown to cause cancer in certain laboratory animal tests. Risk to your health depends on level and duration of exposure. METHYLENE CHLORIDE REDUCES THE BLOODS OXYGEN-CARRYING CAPACITY. NOTICE: Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal. Do not breathe vapors or spray mist. Ensure fresh air entry during application and drying. If you experience eye watering, headache or dizziness or if air monitoring demonstrates vapor/mist levels are above applicable limits, wear an appropriate, properly fitted respirator (NIOSH approved) during and after application. Follow respirator manufacturer's directions for respirator use. Cannot be made non-poisonous. Causes eye burns and skin, nose and throat irritation. Do not get in eyes, on skin or clothing. May be harmful if absorbed through skin. May cause allergic skin reaction. Wash thoroughly after handling. WARNING: This product contains a chemical known to the State of California to cause cancer and birth defects, or other reproductive harm. Wash clothing before reuse. Thoroughly clean contaminated shoes. **KEEP OUT OF REACH OF CHILDREN.**

**First Aid:** In case of eye contact, immediately flush eyes with plenty of water for at least 15 minutes. Get medical attention immediately. In case of skin contact, wash thoroughly with soap and water for at least 15 minutes. Remove contaminated clothing and shoes. Get medical attention immediately. If you experience difficulty breathing, leave the area to obtain fresh air. If continued difficulty is experienced, get medical attention immediately. If swallowed, contact a physician or poison control center immediately. DO NOT induce vomiting unless directed to do so by medical personnel.

> For a detailed Material Safety Data Sheet, visit our website at www.rustoleum.com or call us at 800-225-8543.
> Use this product outdoors, if possible. If you must use it indoors, open all windows and doors or use other means to ensure fresh air movement during application and drying. If workplace exposure monitoring indicates methylene chloride levels cannot be controlled to below the established OSHA exposure limits (29 CFR 1910.1050), then appropriate respiratory protection must be provided. A dust mask does not provide protection against vapors. Do not use in basement or other unventilated area. Spillage: Open containers carefully and close after each use. If spilled, contain spilled material and remove with inert absorbent. Dispose of contaminated absorbent, container and unused contents in accordance with local state and federal regulations. Clean up rags, papers and waste promptly. Allow solvent to evaporate then dispose of in metal container.
> **DO NOT USE ON AIRCRAFT**
> Disposal: Call your local sanitation department for aid in disposing unwanted product in your area or call the Environmental Protection Agency Solid and Hazardous Waste hotline at 1-800-424-9345. Do not dump on the ground or in local sewer of discharge system.

*Id.* at ¶ 13.

When Ms. Atkins arrived home from work the next morning, she found Joshua sitting and slumped over in the bathtub. *Id.* at ¶ 4. Ms. Atkins called emergency services, which reported that Joshua "had obvious signs of death" upon their arrival. (ECF No. 1-2, at ¶ 73). The autopsy and toxicological testing showed that Joshua died as a result of inhalation of methylene chloride vapors. (ECF No. 25, at ¶ 6). One expert report opines that the methylene chloride vapor levels reached the "Immediately Dangerous to Life and Health" range within eight to ten minutes of when Joshua poured the Aircraft Remover into the tin pan. (ECF No. 26-10, at 13).

Ms. Atkins, on her own behalf and on behalf of Joshua's estate, filed suit against Rust-Oleum, alleging in part that Rust-Oleum failed to adequately warn consumers of the hazards of using its Aircraft Remover product. (ECF No. 1-2). Rust-Oleum moves for summary judgment on this issue, arguing that the Aircraft Remover label complied with the FHSA's

4

requirements, thereby preempting any of Plaintiffs' claims that are based on inadequate labeling. (ECF No. 22).

**II. Legal standard**

According to Federal Rule of Civil Procedure 56, a court must grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (internal quotations omitted). Additionally, for a factual dispute to be material, it must have an effect on the outcome of the suit. *Id.*

In reviewing and evaluating the evidence for a motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" non-moving party. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (internal quotations omitted). However, where "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to judgment as a matter of law. *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

**III. Discussion**

Congress enacted the FHSA to "provide nationally uniform requirements for adequate cautionary labeling of packages of hazardous substances which are sold in interstate commerce and are intended or suitable for household use." H. Comm. on Interstate and Foreign Commerce, Federal Hazardous Substances Labeling Act, H.R. Rep. No. 1861 (1960),

*reprinted in* 1960 U.S.C.C.A.N. 2833, 2833. For this reason, the FHSA preempts state law, though on a limited basis. 15 U.S.C. § 1261 note (b)(1)(A). In short, if a cautionary label complies with the FHSA's labeling requirements, then any state law claims based on inadequate warnings are preempted. *Richards v. Home Depot, Inc.*, 456 F.3d 76, 78 (2d Cir. 2006). However, if a label does not comply with the FHSA, then claims based on inadequate warnings may proceed. *Id.*; *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 109–10 (2d Cir. 2001).

Under the FHSA, a "hazardous substance" is a substance that is (among other things) toxic, corrosive, or an irritant, which "may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use." 15 U.S.C. § 1261(f)(1)(A). The FHSA sets the minimum standards for cautionary labeling and prohibits the introduction of any "misbranded hazardous substance" into interstate commerce. 15 U.S.C. § 1263(a). A hazardous substance is "misbranded" if its label does not conspicuously state:

> (A) the name and place of business of the manufacturer, packer, distributor or seller;
> (B) the common or usual name or the chemical name . . . ;
> (C) the signal word "DANGER" on substances which are extremely flammable, corrosive, or highly toxic;
> (D) the signal word "WARNING" or "CAUTION" on all other hazardous substances;
> (E) an affirmative statement of the principal hazard or hazards, such as "Flammable," "Combustible," "Vapor Harmful," "Causes Burns," "Absorbed Through Skin," or similar wording descriptive of the hazard;
> (F) precautionary measures describing the action to be followed or avoided, except when modified by regulation of the Commission pursuant to [15 USCS § 1262];
> (G) instruction, when necessary or appropriate, for first-aid treatment;

6

(H) the word "poison" for any hazardous substance which is defined as "highly toxic" . . . ;

(I) instructions for handling and storage of packages which require special care in handling or storage; and

(J) the statement (i) "Keep out of the reach of children" or its practical equivalent, or, (ii) if the article is intended for use by children and is not a banned hazardous substance, adequate directions for the protection of children from the hazard.

15 U.S.C. § 1261(p)(1). Additionally, the required statements must be "located prominently" and must be "in the English language in conspicuous and legible type in contrast by typography, layout, or color with other printed matter on the label." 15 U.S.C. § 1261(p)(2).

The FHSA is administered by the Consumer Product Safety Commission, in which Congress vested the authority to promulgate regulations. 15 U.S.C. § 2079; 15 U.S.C. § 1269; 16 C.F.R. § 1000.2. The CPSC thus can establish by regulation "reasonable variations or additional label requirements as it finds necessary for the protection of the public health and safety." 15 U.S.C. § 1262(b). If a hazardous substance's label fails to comply with the CPSC's regulations, then that hazardous substance is "misbranded" in violation of the FHSA. *Id.* For example, the CPSC's regulations require the statement of principal hazard, along with the signal word (e.g., DANGER), to be placed on the principal display panel (often the front of the container).[1] 16 C.F.R. § 1500.121(b)(2). Additionally, if a product presents more than one type of hazard, its label must contain, among other things, "an affirmative statement of each such hazard." 16 C.F.R. § 1500.127. Label information nonetheless may be condensed if the "condensed statement contains all of the information

---

[1] "Principal display panel" is defined by regulation as "the portion(s) of the surface of the immediate container, and of any outer container or wrapping, which bear(s) the labeling designed to be most prominently displayed, shown, presented, or examined under conditions of retail sale." 16 C.F.R. § 1500.121(a)(2)(iv).

7

needed for dealing with each type of hazard presented." *Id.*; 16 C.F.R. § 1500.123. The regulations further state that a hazardous substance's label does not meet the FHSA's requirements "if there appears in or on the label (or in any accompanying literature) words, statements, designs, or other graphic material that in any manner negates or disclaims any of the label statements required by the [FHSA]." 16 C.F.R. § 1500.122.

The CPSC can also declare, by regulation, that a particular substance is a hazardous substance if the CPSC finds that doing so "will promote the objectives of the [FHSA] by avoiding or resolving uncertainty as to its application." 15 U.S.C. § 1262(a)(1). Relevant here, the CPSC has used its rulemaking authority to deem methanol a hazardous substance and to specify labeling requirements for products containing four percent or more of methanol. 16 C.F.R. § 1500.14(a)(4), (b)(4). The regulations state, "Because death and blindness can result from the ingestion of methyl alcohol [methanol], the label . . . shall include the signal word 'danger,' the additional word 'poison,' and the skull and crossbones symbol." 16 C.F.R. § 1500.14(b)(4). Further, "[t]he statement of hazard shall include 'Vapor harmful' and 'May be fatal or cause blindness if swallowed.'" *Id.* The CPSC has not promulgated regulations specific to methylene chloride.

Unlike other similar federal statutory and regulatory schemes, the FHSA does not require manufacturers to obtain CPSC approval of labels prior to introducing products into interstate commerce. *See, e.g.*, 21 U.S.C. § 355 (requiring Food and Drug Administration preapproval of new drugs and their labels); 7 U.S.C. § 136a (requiring Environmental Protection Agency preapproval of pesticide label). Compliance with the FHSA is therefore primarily the responsibility of manufacturers. To aid manufacturers, the CPSC's general counsel and staff may provide guidance to manufacturers in the form of advisory opinions and

interpretations of regulations. 16 C.F.R. § 1000.7. Both advisory opinions and interpretations of regulations "may be changed or superseded by the [CPSC]," *id.*, and thus do not carry the same weight as regulations.

Lastly, whether a label complies with the FHSA and related regulations is ordinarily a question of fact for the jury. *See, e.g., Mattis v. Carlon Elec. Prods.*, 295 F.3d 856, 862 (8th Cir. 2002) (holding that whether a label complied with the FHSA was a question for the jury); *see also Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995) (explaining that "it is the court's duty to define the appropriate [legal] standard" when interpreting statutory terms, but that if reasonable persons could differ as to how the proper legal standard applies to the facts at hand, the question belongs to the jury).

Here, Plaintiffs claim, in part, that Rust-Oleum did not place adequate warnings regarding methylene chloride on the label of its Aircraft Remover product, such that the product was "misbranded" in violation of the FHSA. (ECF No. 1-2). Rust-Oleum argues that, as a matter of law, the warning labels on its Aircraft Remover product met, and in some instances exceeded, the minimum labeling requirements of the FHSA. (ECF No. 22, at ¶ 3; ECF No. 23, at 12, 18). Rust-Oleum thus argues that, to the extent that Plaintiffs' state law claims are based on inadequate labeling, such claims are preempted and must be dismissed. (ECF No. 23, at 7). The parties' arguments appear to center mainly on two issues: (1) what significance should be given to various CPSC guidance and determinations made by other agencies, and (2) even if Rust-Oleum technically complied with CPSC guidance, whether Rust-Oleum still violated the FHSA by including language that negated or diluted the cautionary statements.

9

First, Rust-Oleum points to a 1987 Statement of Interpretation and Enforcement Policy, issued by the CPSC in lieu of formal rulemaking, which provided example, FHSA-compliant label language addressing methylene chloride vapor inhalation. (ECF No. 23, at 10); 52 Fed. Reg. 34,698. Rust-Oleum argues that the recommended language—which it included on the Aircraft Remover label—covered both the chronic, carcinogenic hazard and the acute toxicity hazard associated with methylene chloride vapor inhalation. (ECF No. 23, at 12). To bolster its argument, Rust-Oleum cites to a 1992 publication of regulations related to another act administered by the CPSC, the Labeling of Hazardous Art Materials Act. *Id.* at 12; 57 Fed. Reg. 46,626. According to Rust-Oleum, the CPSC indicates in a comment that "vapor harmful" is sufficient for chronic and acute inhalation toxicity. *See* 57 Fed. Reg. 46,626, 46,664.

Plaintiffs, however, point out that the CPSC's stated purpose of each the 1987 Statement of Interpretation and the action taken in the 1992 publication was to provide guidance and regulations, respectively, to address the chronic, carcinogenic hazard posed by methylene chloride. (ECF No. 37, at 5, 9 n.10, 22). Plaintiffs also note that in 2016, in response to a request and subsequent petition by the Halogenated Solvents Industry Alliance (HSIA), CPSC staff stated that the 1987 Statement did not address acute hazards. *Id.* at 7, 22. CPSC staff therefore recommended cautionary language to the HSIA that went beyond "vapor harmful." *Id.* at 6. Although Rust-Oleum is not a member of the HSIA, Plaintiffs contend that Rust-Oleum was aware of the HSIA petition in 2016. *Id.* at 7. Plaintiffs further argue that important new data became known to Rust-Oleum which, due to a manufacturer's ongoing duty to maintain compliance with the FHSA, reduce the relevance the CPSC's 1987 and 1992 publications. In particular, Plaintiffs claim that Rust-Oleum knew about a 2012

study published by the Centers for Disease Control and a 2015 article published by the Center for Public Integrity, both documenting numerous deaths caused by inhalation of methylene chloride vapors. *Id.* at 5–6, 10. Plaintiffs also argue that Rust-Oleum was aware that Europe banned the use of methylene chloride in consumer products in 2009 and that the EPA published a notice in January 2017 that it was considering implementing a similar ban in the United States. *Id.* at 10. In short, Plaintiffs have established questions of fact regarding whether, in light of subsequent publications and events, Rust-Oleum's compliance with the CPSC's 1987 Statement establishes compliance with the FHSA.

Next, Plaintiffs claim that even if Rust-Oleum technically complied with the CPSC guidance, Rust-Oleum violated the FHSA by negating and diluting the required cautionary statements. Plaintiffs argue, for example, that the hazard statements on the principal display panel were inadequate because the "clarifying" statements—"causes eye burns" AND "skin irritant"—following "vapor harmful" "fostered the mistaken belief that vapor is harmful primarily to the eyes and skin and not through inhalation." (ECF No. 37, at 12, 23). Similarly, Plaintiffs allege that Rust-Oleum "imbedd[ed] the CPSC warning language in a lengthy and jumbled patchwork in its back panel," thereby "diluting and negating the effectiveness of mandated warning language" in violation of the FHSA. *Id.* at 23. Rust-Oleum rebuts Plaintiffs' contention with the opinions of two experts who state that the Aircraft Remover label complied with the FHSA. (ECF Nos. 26-12, 26-13). Plaintiffs, however, support their argument with the opinions of their own experts, who conclude otherwise. (ECF Nos. 37-5, 37-7). Viewing the facts in the light most favorable to Plaintiffs, and without ruling on the pending motions in limine, the Court finds that Plaintiffs have established a genuine dispute of material facts related to how an ordinary consumer would

understand the Rust-Oleum Aircraft Remover label and whether the label met the minimum standards of the FHSA.

In summary, there are questions of fact related to the adequacy of the warnings on the Aircraft Remover label. As a result, the Court cannot decide the issue of FHSA compliance as a matter of law, and summary judgment is not appropriate at this time.

### IV. Conclusion

Based on the foregoing, Rust-Oleum's Motion for Summary Judgment is hereby DENIED.

DATE  February 3, 2020

Marilyn J. Horan
United States District Judge